When you're ready. Thank you. May it please the court, David Rosenbaum representing the Gila River Indian Community. As a point of protocol, I'd like to acknowledge the presence of the governor of the Gila River Indian Community, Steve Lewis. Mr. Shanker and I agreed to divide our time equally. We would each like to reserve two minutes, so I'll try and go about eight. I want to its requirements are strict. To use 4F property, there must be no feasible and prudent alternative, which means under the case law and the regulations that a highway may not use 4F property unless there are truly unusual factors such as community disruption reaching extraordinary magnitude. The record shows no such findings by the agencies. Instead, the agencies say that they satisfy their 4F obligations because any alternative to building this freeway in the E1 alignment, which is east to west, bordering within feet of the Gila River Indian Community, and then turning north until you reach the western alternatives, that any other alternative but E1 would not meet the project's purpose and need. But one can't narrowly draw a purpose and need statement to avoid 4F obligations, to take the hard look that 4F, that Overton Park, that Stop H3 say has to be south of Gila River, any of the non-highway alternatives, because they concluded that those alternatives wouldn't meet the purpose and need. The purpose and need being, they said, a major transportation facility, i.e. a highway, in the study area. You see the study area in the map on page 16 of our North of Pecos Road. Now, if the alternative were to be south of the Gila River Indian Community, how far south are we talking about? The reservation's fairly big. It is. So the alternative south of the community included the I-85 alternative. There were other alternatives, the US-60 alternative, which would have been north. And, of course, the non-freeway options. Counsel, but let's take the answer to Judge Fletcher's question. Wasn't that route 54 miles south of downtown Phoenix? Yes, but understand the traffic congestion that is trying to be solved by this freeway. Most of the traffic congestion, if you look at the various charts, are north of South Mountain. That's where Phoenix, Scottsdale, Tempe, all of those densely populated communities are. So this is, in a way, an effort to divert some of that traffic around the city. So if people are living in the far southeast valley, and somehow they want to go to the far west side of Phoenix, they could avoid the main rush hour traffic in Phoenix. But I understood that that route south of tribal land would be too far south to meet that need. We don't know that, because that traffic analysis was never done. And that's the problem. If you look at the traffic studies, this is the congestion solution that would have to be weighed, if a 4F analysis was done, against the severe harm to 4F properties. And we're not talking about... I'm looking at SCR 734. It's the map, basically, of the project. And am I correct in looking at that map, if the route had been moved just a few hundred yards south of where it is, would we have avoided the 4F property entirely? No. No. Why not? Because the three ridges that will be blasted through are after the turn to the north, to the northwest. So the E1 corridor... My question is, if that route were moved just a little bit further, I guess in this case it would be southwest, would that problem be avoided? There's nothing in the record suggesting that at all. Do you know the answer to the question? You've lived with this case for years. I think the answer to the question, but I can't cite you in the record, is no, the ridges will still be impacted. That is to say, to your representation, that the ridges continue onto reservation land. So if you move to some degree southwest into the reservation land, you're nonetheless going to cut through the ridges because that geographical feature is continuing. There will still be impact, not on necessarily South Mountain Park, but I understand that the 4F property here is traditional cultural property as well. The record shows, according to the agencies, that 3.1 miles of this freeway, not just the 31 acres, will go through South Mountain Park that is traditional cultural property to Gila River. But if I may, let me get back to the... I want to get an answer to my question. I'm not sure I understand your answer because I'm looking at this map and it altered just slightly to the left and to the south. So I guess to the southwest and to the south, that it would avoid touching the regional park completely, right? I can't give you the dimensions. The problem is that analysis is never done in this record. Council, it's not a hard question. Is the answer yes or no? The answer is I don't know how many yards or feet or miles one would have to go to avoid the mountain as opposed to the regional park. Okay, but you agree with me that it would avoid the park, and I hear your argument that 4F also includes cultural land. But the problem with, I think, underlying my question is that the tribe voted twice not to sell or give up any of its land to address, to try and resolve the impact, at least on the park, right? It did, but there were many other alternatives that would avoid the use of 4F property entirely, which were never studied. So let me take a... If I may... But I thought they had studied more than a dozen different alternatives. They eliminated at the early screening process all alternatives other than the E-1. Well, ultimately they decide on the E-1, but the question is, didn't they look at other alternatives including no action? The no action... I thought I read a huge section of the EIS that had not... The only comparative measuring traffic congestion is between no action and build the E-1. There is no analysis of the impact on traffic congestion of any of those other alternatives, but they did analyze non-freeway options, more buses, improvement in arterial streets, et cetera, which remarkably showed a greater reduction, a greater reduction in traffic congestion than the freeway. They are predicting a 31% level of unmet traffic demand in 2035. That is reduced to 20%, they say, assuming their data is appropriate, they say, if the freeway is built. That number reduces to 18%. It's a 13% reduction through non-freeway alternatives. So... I thought I read that in the no action alternative that if they did... That the current freeway system is only meeting 84% of demand. Is that correct? That's right. So we have a huge traffic congestion problem right now, today. And so the question is, if you want to take some measures to reduce that demand, you have to weigh those benefits against the magnitude of the harm of this 4F property. And they never did that because they said any alternatives other than the E1 alignment means we don't need to study it. So there's nothing in the record showing... What's in the 70,000 page record here? Everything but what I just said. There is... There is... They say in their own briefs, and it's throughout the record, that they looked at north of Phoenix in stage 2, never went to 3, 4, or 5, and no comparative traffic analyses. And that's what they need to do. I promised Mr. Schenker that I wouldn't eat up his time, and I'm already halfway through. Well, you wanted 10 minutes on your side with two minutes for rebuttal. You used 10. We'll give you two minutes. Well, thank you, Your Honor.  Thank you, Your Honor. Good morning, Your Honors. Howard Schenker for the Park Plaintiffs, collectively. First, I'd like to point out that NEPA, at its heart, is really a procedural statute. What we have here is a failure of process. So, for example, the law says that you can't have a purpose and need that's so narrow that only one alternative will satisfy it. Well, here they talk about a major transportation facility, but they expressly define that as the South Mountain Freeway. And with the gift of hindsight, we see that any alternative that's not the South Mountain Freeway is dismissed because it's not consistent with the purpose and need for the project. Well, am I wrong? I thought the surrounding property that is not parkland was already substantially developed. I forget what the numbers are, but it's more than two-thirds? That's actually a misnomer because they cite to Laguna for the proposition, and let me get you the exact numbers. This had to do, actually, with the analysis of the no-build option. What defendants did is they used the same model, the same socioeconomic, same demographic model to judge the impacts for the action model and the no-build option. But I thought what they were trying to look at was what is the current existing use of the surrounding area that this freeway would serve? Well, what they did is they looked at Laguna, which said that 98.5, and this is a toll road in Orange County, 98.5% of the area was already built out. Right, but here the numbers are less than that, but they're still fairly substantial, are they not? Well, Your Honor, here they're arguing 88%, which to me seems to be pulled out of whole cloth because according to the environmental impact statement, it says approximately 57% of the study area is developed. The remaining 43% consists of agricultural land, 22%, undeveloped land, 10%, and open space, 11%. So this really is not a situation where the area is completely developed. And frankly, just going back to one of the- But doesn't that include the zoning that has already been put in place for future development? I'm not sure, Your Honor. I thought I read that in the record. Zoning doesn't preclude future development or changes. And in fact, if you look at- Well, yeah, but don't you have to consider that, I guess is what I'm asking. I assume you have to consider it, but if you look at Laguna, and I believe it was in footnote eight, they actually had development contracts and commitments that they were talking about when they came up with the 98.5% number. So the problem here- I mean, as I understand it, what we're dealing with here is basically the southwest quadrant of the greater Phoenix metropolitan area, and trying to address the growth that has already occurred in that quadrant, and that is expected to grow in the future, right? Isn't that what all this planning was about? I think if that's what the planning was about, we wouldn't be here today in court. I think what the planning is about- I'm having a hard time. Maybe I'm not understanding your argument very well, but I thought that the transportation planning that we're talking about here has been ongoing for 30 years. I mean, the record talks about hundreds of public meetings just with the GRIC alone, and I don't know how many other- Well, Your Honor, one of the problems is this is a study area and a right-of-way that were identified in the 1980s that the state has simply carried through, and the changes on the ground are significant. So they continue the study, but the alternatives analysis memorandum that they rely on and that they cite to, and they try and include in the EIS, as opposed to discussing a reasonable range of action alternatives, that was actually published in October 2002. The record of decision in this case came out in 2015. That's 13 years later. CEQ guidance says that if an EIS is more than five years old, you have to look at it to see if it needs supplementation. The FHWA regulations also tell you, and let me give you an exact quote. What was the record of decision filed in this case? 2015. 15. Yes. Right? So, I mean, doesn't- I mean, I haven't read all 70,000 pages, but isn't that what constitutes the record? In other words, all of this planning that's been done by the metropolitan area group, all of the public scoping, all of the notice and comment, isn't that what the record is full of? Covering a period of decades? Your Honor, and the regulations and guidance documents actually address that. According to FHWA guidance, and I'll quote, in most cases, the assessment of the affected environment and environmental consequences conducted during the transportation planning process will not be detailed or current enough to meet NEPA standards. And the law is very clear that these transportation planning documents have to meet NEPA standards. So what we're seeing is a right of way that might have met regional transportation needs in the 1980s, now it wouldn't. And frankly, going 53 miles south of Gila River probably would do a better job for the truck route that's supposed to go around Phoenix. This will not alleviate traffic during rush hour at all. But that's not our judgment call to make, is it? Don't we have to defer to the Metropolitan Transportation Planning Authority's decision that that's too far south in order to meet the need? Well, Your Honor, everything- Or do you want the court to substitute its judgment for that of the agency? No, I'd like the court to impose the process that's required by law. So here you have a purpose and need that allows for one action alternative. You don't have an analysis of a reasonable range of alternatives. And then with your no-action alternative, there's no baseline data. And it's well settled in this circuit that the apparently unanswered concern of a sister agency weighs as a factor pointing toward the inadequacy of the EIS. In the comments to the FEIS, the EPA says, in our comment letter on the draft EIS, EPA noted the need to analyze the no-action alternative using updated socioeconomic projections that do not assume completion of the South Mountain Freeway. In the final EIS, there continues to be a lack of analysis regarding the projected differences in land use and emissions if no freeway were to be built. To model traffic volume, speed, and emissions by removing the road segments representing South Mountain, while leaving the socioeconomic inputs constant, does not provide an accurate comparison of these alternatives as is required under NEPA. So, we have an inadequate purpose and need, no analysis of a range of alternatives, and a flawed no-action analysis. I see my time is running a little low. I would like to address briefly the air and impacts on children, because I think that our briefs could have been a little bit clearer on that. Defendants have asserted that children are located in the same areas and thus have the same exposures as the general population, and that they did a quantitative hotspot analysis and found that it wouldn't cause a violation of NAC's national ambient air quality standards. As a result, they're saying that children, the impacts on children don't need to be evaluated. Again, the US- How can you do that for a specific area? In other words, if you're looking at air quality in the entire valley of the sun, how do you localize the impact on air quality from this particular project? Well, there- I mean, are there tools that exist today to do that? Yes, your honor, there are tools. And in fact, what the EPA said about that was the conclusion in the final EIS that children are inherently accounted for in the analysis conducted for the population as a whole does not meet the intent of executive order 13045. The construction of an eight lane freeway with diesel truck volumes of up to 17,000 per day in an area with a large population of children constitutes a need to analyze, disclose, and mitigate impacts to children. So there are actually two processes. One is for MSATs, the mobile source air toxics. Those are different than the NACs. What defendants say is mobile source air toxics in the entire study area will be EPA again said is the conclusion that MSAT emissions will decrease by as much as 91% pertains only to the overall study area and does not apply to the potential impacts that may be experienced directly adjacent to the project corridor. So for things like benzene, formaldehyde, diesel particulates, they do no roadside analysis at all. And there are 17 schools within a half mile of this right of way because it was selected in 1980. Now, with regard to NACs, those are different. What they looked at with the National Ambient Air Quality Standards was only PM10 and carbon monoxide. And they did a hotspot analysis. But with NACs, what we're saying is they didn't do the analysis improperly. The analysis was proper, but they can't use that as a shield to say that they don't have to analyze impacts on children. Because first of all, NACs are set for a specific criteria pollutant. They don't take into account the cumulative and synergistic impacts of emissions of MSATs and other NACs. You're starting to lose me with all the science. But isn't this the area under NEPA where we have to give the agency the greatest deference in determining which standards and what scientific equipment studies are necessary to do? Two problems here is you don't have to give them the greatest deference because they're not exercising their expertise. They're failing to observe the process required by law. Well, essentially, your argument is that they exercise bad science. And I thought that's what we addressed in Lands Council. That's actually the argument that the EPA is making, Your Honor. The EPA points out that. And the EPA created these tests. So for the toxic pollutants, the EPA says you need to do some near roadway emissions testing. You just ignored it completely. And for the NACs, the science was fine. But it doesn't account for all of the impacts. Okay, we've taken you slightly over your 10 minutes. What we'll do with both you and Mr. Rosenbaum is we give each of you the two minutes in rebuttal that I think you hoped to save. Thank you, Your Honor. And now let's hear from the other side. May it please the court. I'm John Arbab, appearing on behalf of the Federal Appellees. With me at council table is Rob Thornton. He is representing the State Appellees. And we will each be arguing for 10 minutes. Your Honors, I think the best way to deal with this is if I can respond to the First of all, on Section 4F, Judge Tallman was quite right about not only the very small amount of impact that there is on South Mountain Park, but... Wait a minute. Very small amount of... They're cutting through three ridges? No, Your Honor. That doesn't sound like a very small impact. Your Honor, only two ridges are in the park. And the total footprint is 31 acres. It was scaled down from a 40-acre footprint. And so that's about 0.2% of a 16,600-acre area. What's the level of the ridgeline and then the level of the freeway that's going to be cut through it? I'm not sure how high up in the air the roadway will pass as it goes through those two peaks. But another important point is I think it was... So if you don't know that, it's hard for you to tell me that there's minimal impact. No, Your Honor. The height above ground level is not really the key. The more relevant factors are the small footprint of only 31 acres out of a 16,000-acre park, but also... You know, I'm not sure I want to spend too much time on this one. But if what we're talking about is cutting a deep gash through ridgeline and parkland with a freeway, the fact that the freeway space that's occupied by the roadway itself is very little doesn't tell me very much about the visual or ecological impact of that freeway. Your Honor, there is evidence... There's discussion in the FEIS about the visual impact, and it will be very minor. There are mitigation to make the roadways that passes through those two peaks blend in as much as possible with the natural scenery. Another important factor is that I think counsel said that 3.1 miles of the highway will pass through the park, but that's incorrect. It's only nine-tenths of a mile. So we're talking about a relatively small footprint on the park that will have very little visual impact on the park. What I really want to ask you is to respond to Mr. Rosenbaum's argument that other alternatives, for example, an alternative going south of the reservation were not seriously analyzed. Could you respond to that argument? Yes, Your Honor. The south of Greek land alternatives were seriously analyzed, and the determination was made that that alternative passed so far south of downtown Phoenix that it would not be used. It would not help to alleviate the problem that this entire project was designed to address. My understanding is an awful lot of the traffic that's going to go through this southbound freeway, if it's to be built, is actually going to be traffic that's coming around Phoenix on its way to Tucson. That is to say, it's not local traffic. It's traffic coming through. And if it's traffic coming, for example, from Los Angeles to Tucson, I don't know why south of the reservation is a bad alternative at all. Your Honor, there's a separate route that is a way of bypassing. There's discussion in the FEIS about a truck bypass. That is a completely separate road that already exists. But that hasn't proved to be a solution to the problem that this project is designed to address. The agency gave very careful consideration to other alternatives. If to go south of the park, it would have been necessary to go onto Grick's land. And for a time, the E2 so-called alternative was in the mix. But in, I believe it was February of 2012, Grick, as it has a right to do as a sovereign, decided not to allow any alternative to be constructed on its land. So that put the agencies in something of a bind. They had to either go north of Grick's land or south of Grick's land. And the 4F analysis is quite detailed about why the south of Grick land and north of the park alternatives are not prudent and reasonable for 4F purposes. Next, I'd like to address a few of the arguments that Mr. Shanker made in regard to NEPA. First of all, we're not talking here about the agencies using an ancient local plan and slavishly refusing to depart from that in its NEPA analysis. For one thing, the regional transportation plan that included a roadway somewhere in the study area, that was done by the local agencies, the Maricopa agencies in 2014. It's very recent. So the local agencies who are the sponsors or who are asking for federal funding to build this project, as far into the NEPA process as 2014, they are reaffirming that, yes, we think in our... Well, I think the key word is reaffirming. Anybody who looks at the record here knows that the freeway that's now being proposed was proposed in roughly the same form beginning in the 1980s, and plans were made to sort of not do excess building that would then get in the way of it. I mean, everyone and his brother knew that this was a realistic possibility beginning in the 1980s. Though your word reaffirmed, I think, is the right word. That is true, Your Honor. But my point is that between the 1980s and 2014, the question has been looked at again and again by the local agencies, and they still believe that a roadway in this area is appropriate and necessary. And it's not the... The agencies here considered a lot of alternatives besides the one that was ultimately selected. The one that ultimately was selected was not precisely the one, the route, the alignment that appeared back in 1985. Recall that in the so-called western part of the study area, there were three alternatives, W59, W71, and W101. The W59 alternative was ultimately selected in the western area, but it was tweaked from the W55 alternative. But the real fight in this case is not about those three alternatives that show up in the far west. The real fight is about the area that's off to the east and then comes up through the park. Oh, that's true, Your Honor. And the agencies determined that really of all the possibilities, numerous possibilities as we were discussing with regard to 4F. Numerous possibilities on the east side were studied, but as NEPA allows and as 4F authorizes, they were eliminated from detailed study because of the impracticalities and of the lack of prudence of those alternatives, their impacts on existing communities north of the park, their failure to satisfy the purpose and needs. And so it's not really true to say that those things were alternatives were rejected just because they didn't meet the purpose and need. I would also- Counsel, with regard to Judge Fletcher's question, wasn't that the same situation that we faced in City of Carmel with regard to the route for Highway 1 between Monterey and Carmel Valley? In other words, the route that was ultimately chosen was the one that everybody had been focusing on for decades. Yes, I think that that case, I believe, does support the agency's position here because it illustrates that there's nothing as far as NEPA is concerned or really any statute at issue here, there's nothing sinister or untoward about an agency having in mind an alternative at the beginning of the process. But to say on this 70,000 page record, as Judge Tallman was pointing out, that the outcome here was sort of preordained or was not done in good faith because the agencies all along would refuse to authorize anything else at the end of the day, the record just does not bear that out. But doesn't he raise a process, and I seem to hear him saying process, process is everything that is Mr. Rosenbaum, is everything here, and he's saying that the 1980s study that I'm asking whether or not that 1980s study that was done, whether or not the later studies that you say many studies were done, whether or not that cures, if that's a good word, the concerns that are being raised about whether or not it satisfies FOIA, isn't that what he's arguing, that you've taken a 1980s study and you're just lifting it and placing it in place after 2014, around 2014, without having the studies done to support that continuing thought? That does sound like Mr. Shanker's argument, but I'm asking, I don't know, it might not be his argument, I'm asking if that is his argument, what is your answer? If that's his argument, it's simply not borne out by the record. I'm about to take up Mr. Thornton's time, so I would just ask that the judgment of the District Court be affirmed. Thank you. We can start with a clean ten minutes. Your Honor, Robert Thornton on behalf of the Arizona Department of Transportation and the Director of the Department, I'd like to respond to the Court's last series of questions regarding this issue of the so-called 1980s study. First to understand, Your Honor, Congress has mandated a very elaborate transportation planning process found in 23 U.S.C. 134, 135. The statute requires transportation agencies to look at least 20 years out in the future, so transportation planning necessarily by law looks decades into the future. Now that's not a static process, Your Honor. The same statute mandates that the regional transportation plan is updated every four years, so it's not a static process. It's a dynamic process that looks as circumstances are changing. That's precisely what happened here. Yes, the original regional transportation plan that's relevant was adopted in 1985, subsequently updated many times, most recently in 2007 to reflect the changes that Congress adopted in 2005. And throughout those changes, Your Honor, as the years have progressed through statutory changes, Congress has made it crystal clear that the analysis of individual transportation projects in a NEPA document is necessarily linked to the policies and objectives established in the regional transportation plan. This is what Congress stated in 23 U.S.C. 139F. That's what this court found in HonoluluTraffic.com versus Federal Transit Administration. And that is consistent with a line of other Ninth Circuit cases holding that the purpose and need of a project is necessarily linked to the statutory objectives. And the statutory objectives in this case set out by Congress in 23 U.S.C. 139 is that transportation planning governs and is important to the NEPA analysis, the 4F analysis of individual transportation projects. And this is further codified in what's called the linkage rule, which is found in 23 CFR section 450.318. Now to reference, you know, there were times during Mr. Rosenbaum's argument that I thought he was inviting the court to act as traffic engineers. And Judge Talmadge's comments indicated clearly that's not the proper role of the court here. All of the transportation agencies, the Metropolitan Planning Organization, the State of Arizona, the Department of Transportation, the Federal Highway Administration have all looked at the traffic need and the transit needs and decided that this project is a needed project. Now, I wanted to go to respond to Judge Talmadge's inquiry about City of Carmel-by-the-Sea and purpose and need. In City of Carmel-by-the-Sea, there was a very similar challenge to the Hatton Canyon Freeway Project alluded to. Again, a project that had been studied, had been on the planning documents for a long time. And the plainest argument there was that the objective that was set out by the Federal Highway Administration for that project, which set a specific level of service, what traffic engineers refer to as level of service C, was too narrow and necessarily preordained the outcome of the NEPA process. And this court held that no level of service C was a reasonable objective, reasonable transportation objective, and was not so narrow as to violate the requirements to analyze a reasonable range of alternatives. Now, with regard to the alternatives, there's been a, I think, a mischaracterization by the Appellant's Counsel regarding the record. Chapter 3 of the EIS has an excruciatingly long discussion of the lengthy process that was used, not just accepting the regional transportation plan determination, but revisiting that entire analysis, including traffic analysis. I would say not only excruciatingly long, but an excruciatingly small print. For old judges. Your Honor, we actually worried about... I don't know why you guys couldn't have managed to give me some larger print. It was agony. Your Honor, I appreciate that, and that'll be good advice to the preparers of environmental documents. I think sometimes they're thinking... I think the original documents had larger print. You reduced it when you put it in the ER. And I apologize, Your Honor, that may have been a function of what you need to do when you reduce a PDF. I don't know. But I appreciate the Court's comment about that. So there was a broad range of alternatives analyzed, including going back to re-look at modal alternatives. That's documented in the record. Different corridors, and then down to alignment levels. There were nine alignment alternatives in the west, nine alignment alternatives in the east. Ultimately, as the document describes, those were screened down, but not without significant analysis. With regard to this issue of Section 4F, Mr. Rosenbaum alluded to the unusual circumstances standard. That ignores the now well-established line of cases in this Court that the Federal Highway Administration can determine that an alternative is not prudent if it does not accomplish the purpose and need of the project. And again, we would cite to this Court, Honolulu Traffic.com v. Federal Transit Administration, again where the same argument was made that they didn't adequately analyze reasonable and prudent alternatives under Section 4F because the purpose and need was too narrow. This Court rejected that argument, saying that it was properly linked back to the purpose and objectives articulated in the Regional Transportation Plan. I might add that in Honolulu Traffic.com, unlike the plan here, the Regional Transportation Plan in Hawaii said the objective is to build a high-speed, elevated transit facility from the west of Oahu through downtown Honolulu. It was a quite specific objective articulated in the Transportation Plan. Much more specific, frankly, than the purpose articulated here, which as Chapter 2 describes is to accomplish the very significant need. Now, I wanted to, in specific answer to Judge Tallman's question, Your Honor, you're entirely correct. If the project were to be moved in the area of South Mountain 100 yards, we would be on the Gila River Indian Community land. And with regard to the terrain there, basically when you get to the border of the Gila River Indian Community lands and the project alignment that's flat there and then the ridges start going up, there is, of course, as NEPA required, an extensive analysis of visual impacts on the mountain. Those were not hidden. Those were disclosed. They were described, responded to comments. Now, I wanted to shift to Mr. Shanker's arguments with regard to air quality. First, there is, it is uncontested in this case that this project meets the requirements of the Clean Air Act. The Environmental Protection Agency establishes for what are called criteria pollutants national ambient air quality standards, carbon dioxide, particulate matter, ozone. Under Section 109 of the Clean Air Act, those are set on the basis of potential health effects with an adequate margin of safety considering the potential impacts on sensitive populations, including children. There is no contest in this case. The EPA signed off on and agreed that the air quality analysis, in fact, uses EPA models, used EPA methods. They concluded that the analysis complied with the Clean Air Act requirements. With regard to mobile source air tactics, there were, there was substantial disagreement and substantial discussion amongst the agencies during the process, frankly, between the draft EIS and the final EIS, the Arizona Department of Transportation Federal Highway Administration, sat down for months, many, many months, with the Environmental Protection Agency to do additional analysis of the mobile source air toxics issue. There is extensive discussion of the rationale for why it is the precise methodology that EPA was suggesting was not adopted, but there were, frankly, modifications to the methodology. So, for example, Mr. Shanker referred to one study area that was used for mobile source air toxics. That's factually incorrect. In response to public comments, the transportation agencies divided the study area into two. Basically, the developed area on the east side of the project, what's the area called Ahwatukee, adjacent to Chandler, Arizona, and the area on the western side of the project in Phoenix, Levine, and Australia, so there were two sub-areas. That MSAT, the acronym Mobile Source Air Toxics, analysis concluded that in 2035, the amount of mobile source air toxics emissions would be reduced by approximately 90, up to 90 percent, depending on the specific pollutant, compared to 2012 levels. Now, how does that happen? Well, you better tell me pretty fast how it happens, because you're out of time. Yes, that happens because the EPA has adopted a very vigorous, aggressive measure to regulate emissions of automobiles, and it's a very effective regulatory scheme. Just finally, Your Honor, this project will not be used for people like me driving from Los Angeles to Phoenix. This is not a Disneyland bypass. This is to address the very acute congestion that's documented in the record of congestion on the existing highway and arterial system in Phoenix. Before you sit down, with the Chief's permission, if we were to enter injunctive relief here, or send it back and stop the project, what kind of costs would the public incur? I want to know the practical impact. The practical impact would be, I'm doing this from memory, Your Honor, but I think in the briefing on the Motions for Injunction, Penny, and Appeal, that we documented damages of approximately $200,000 per day. Thank you, Your Honor. Thank you. Now, let's put two minutes on the clock, first for Mr. Rosenbaum. Thank you. I want to briefly address two points. One, the impact on the 4F property, that is the traditional cultural property, and then the reliance on prior traffic planning. The over three-mile impact on traditional cultural property is right in the final environmental impact statement. It's in the 4F chapter. If you look at Volume 8 of the Supplemental Record at 1505 and 1506, in discussing South Mountain, Mooladag Dawag, as a traditional cultural property, it says, direct use. The E-1 alternative, I had to blow this up on my iPad, it is small, the E-1 alternative would result in direct use of the TCP. Approximately three miles of the Freemay alignment, go to the next page, would pass through the mountains and would affect the southern and southwestern portions of the TCP. That's where I got that. We're not talking about just 31 acres of park land, which I don't want to minimize, but with respect to my clients, the Gila River Indian Community, the damage is immense and irreparable and it's right in the agency's own documents. We cited ER5-015. Council, can I ask you a question about that? I thought I had read where the tribal cultural officer, I may have the title wrong, had signed off on this project at some point. Is that not true? Absolutely not. At every stage in this process, and you'll see it throughout the 70,000 pages, the tribe has expressed its objection to the project. What the tribal officer did say is that he is involved in the mitigation effort with ADOT, and they are cooperating in the mitigation effort. But the mitigation- So the consent was to the mitigation plan? If somebody's coming to destroy your property and you have a chance to mitigate some of the harms, you will cooperate. And that's what's going on. If it was more than cooperation, didn't the tribal officer concur in the mitigation plan that was proposed? There is agreement on a mitigation plan, disagreement in the need to mitigate in the first place. I understand your point, but they did agree with regard to the mitigation proposal that was offered. I don't know if there's concurrence. There is cooperation. I saw the word concurrence. Now maybe that's the defendant's semantics and not the one that you want to embrace. Maybe your word would be acquiescence, unwilling acquiescence. Very unwilling. And if you read the pages that I was citing, the harm to the community is devastating. In fact, in the draft environmental impact statement, the agencies write that even with mitigation, implementation of the proposed action would alter direct physical connection of community members with their homeland. Talks about how important the mountains are in the history and traditions of the community. It's involved in current day songs and practices. That is irretrievably broken. Let me talk, I know my two minutes are up, with respect to prior traffic planning. The flaw here is that in none of the prior traffic planning was there any evaluation analysis of the 4F issues. The purpose and need statement in this case was prepared in 2003. If you look at the record, there's a chart of ADOT announced meetings. There were two ADOT public meetings prior to the preparation of the purpose and need memorandum. That's supplemental record. I thought the tribe participated in the MAG. They've been involved in these transportation planning meetings for decades. They are one of about 30 to 35 members of MAG, every town, city. Okay, but I assume that they speak up and make comments when they have concerns about what's being proposed. There is nothing in this record showing that at any meeting, at any agenda, there was any discussion of 4F issues. It's not their obligation at a MAG meeting, which has all sorts of other items on their agenda to raise the 4F issues. What the regulations say is that if you're going to rely on prior regional planning, prior traffic planning, at some point there has to be consideration of the appropriate issues under NEPA, therefore under 4F. So when the purpose and need was nailed down, if you read this, page one of that purpose and need memo in 2003 says, this will be the basis of chapter one of the final environmental impact statement. And so it was 11 years later. And the purpose and need was build this freeway. Thank you. Thank you very much. Mr. Shankar? If you'd put two minutes on the clock. Thank you, Your Honors. First, I want to make clear that the FHWA guidance with regard to transportation planning specifically says that the environmental impact statement ultimately will be judged by the standards applicable under NEPA regulations and guidance from the CEQ to the extent the information incorporated from the transportation planning process standing alone does not contain all of the information or analysis required by NEPA, then it will need to be supplemented by other information contained in the EIS. So what we have here is a tremendous failure of process. They also talked about the statutory context in Honolulu traffic. That was to provide public transportation between one of the most congested urban corridors in the country. The physical limitations were palpable and even so... But how is this different from the city of Carmel? Where the geography between Monterey and Carmel Valley was such that there really was only one feasible route that could be addressed unless they went through protected areas of Haddon Canyon. Well, the geography here has nothing to do with that. It is feasible to go south of Gila River. I actually live in Ahwatukee. This is going to have no impact on my ability to get into downtown Phoenix 30 years from now or the day it's built. It's just a truck bypass that's designed to go to Tucson. Is there not an already existing truck bypass? I thought that's what I heard Mr. Well, the fact is that the no-action alternative is a viable alternative and should have been considered. No, no, no. Counselor, that's not my question. I thought I heard him say that there already is a truck bypass to Tucson. The I-885 is, but a lot of trucks will now not take that truck bypass because this one is going to be a little bit quicker and it's going to take them through a bedroom community. So there is an existing truck bypass? Per se. My last point, the last point... I mean, either it exists or it doesn't. Well, it's not a dedicated truck bypass for the people who use it as well and this one will cut off a few minutes of travel to Tucson from L.A. The last point I'd like to make is both NEPA and 4F require mitigation. 4F requires all possible planning to mitigate harm. In this case, they didn't even have the 15% design plan until after the record of decision was issued. Clearly, that's not all possible planning. I thought the problem with that is it's kind of a chicken and egg problem that you can't wait too far into the process before you begin and so the statute or the regs or whatever say start at 15%. No, Your Honor. That's not what the law says? The only prohibition is not having it designed to 100% in the transportation statutes. So where does the 15% come from? It's just an arbitrary... It's a completely arbitrary number and you can see from both the mitigation and the 4F analysis, they put off a number of the mitigation planning until the design phase because they simply don't have enough information about the design of the project at this time. Thank you. If there are no further questions. I thank both sides. Very good arguments. Thank both sides for your arguments. Protecting Arizona's resources and children and Gila River Indian Community versus Federal Highway Administration et al. now submitted for decision. We're now in adjournment. We've got students here. We will have conference. While we're at conference, our law clerks will talk to you and then we'll come back out and talk to the students. But we're now in adjournment.
judges: W. Fletcher, Tallman, Hoyt